Good morning. May it please the Court, I'm Abram Salekin, who along with Sharon Fisk are here for the appellants, Robin Gonzalez and Janet Polacek as the co-executives of the estate of Emanuel Trompeter. There are three issues before the Court. The amount and value of certain omitted assets that were left off the estate tax return, the value of certain preferred stock, and whether or not the fraud penalty applies to some or all of the deficiency. I will combine the preferred stock argument with the omitted asset issues slightly and then primarily with the fraud issue. The omitted assets issue started with the notice of deficiency, which claimed that there were $14 million of assets that were not disclosed on the return at all, totally omitted. When the case got to the tax court the first time, the Court determined that there were not $14 million of assets, but there were $4.5 million of assets consisting mainly of gems, jewelry, furniture, and a music collection, just those four categories. When the case first came to this Court, it was set back on the basis that there were inadequate findings to enable the Court to make an appropriate review. This Court requested the tax court to make specific findings on what the omitted assets were and their valuation. The tax court then issued a supplemental opinion in which approximately 80 pages were devoted to the omitted asset issues. After the Court got to approximately $2 million of omitted assets, it had no more omitted assets to claim and started going to other things that were disclosed assets that appeared on the return. As a preliminary observation, the Court talks about reliance on a person named Joe Pascoe. Joe Pascoe was a person who filed a creditor's claim in the decedent's estate probate proceedings in California. His claim was rejected. He filed the lawsuit, which was dismissed on demur. Mr. Pascoe never testified in the tax court case. No Pascoe exhibits were introduced in the tax court case, and yet the Court appears to rely in part upon what Mr. Pascoe may have known or didn't know. After getting beyond the $2 million, the Court then goes to assets that were disclosed on Exhibit F-10. They were disclosed in an appraisal by Butterfield and Butterfield, a very prestigious appraisal and auction organization, and an 8-page list set forth various items, including ivory, jade, furniture and rugs, aggregating $1,833,000 of value ascribed by the Court, that were set forth on the return in great detail. The Court also indicated that there were 31 coins that were omitted, despite the fact that at the trial, every coin was either covered by a stipulation or was the subject of the main issue of the case, which was the value of the gold coins. Well, on the coins, I do have a question about that, since you're there. It would seem that there was, at some point in a, I don't know if it was a diary or there was something where one of the daughters referenced approximately 500 coins, correct? Yes, there was. And then what was actually in court was it was 31 less than that, that you would say would be accounted for. Why couldn't the Court look at, say, all right, you know, I think when you put the 500 down there, that you knew what you were talking about, and I've determined to be a lot of other lies or misrepresentations or fraud and say, I just, and the coins are not, they're worth, what, 13, the total amount is something like $407,000. I mean, that's a lot of money. Why couldn't the Court say, based on other credibility issues and the fact that it was written down at 500, even though it isn't accounted for in the way that you're pointing out here, I still think that there were 500 and they've got 3,100 somewhere else, or there's, I think there's this person, Goldberg, who he called into question something about the credibility there. Why couldn't, and he didn't testify, right? No, Mr. Goldberg did testify. Okay. What did he say about the coins? Mr. Goldberg testified that, first, he did a great job at the auction, that he didn't lose in the litigation, though he did, and that all of the coins that he had were returned. The record, based on a letter from Mr. Goldberg's counsel to the Estates Council during the course of the Superior Court litigation, said, we have done a diligent search for all of the coins in our possession. We have located two coins that were sold and we're sending you the proceeds, and those proceeds were reported on the estate tax return. And we have found a few additional coins which will be delivered to you, and those were reported on the estate tax return. In light of the fact that the Goldbergs were basically hostile enemies of the estate after the lengthy litigation, the Goldbergs were informants in the case and sought a reward for their testimony, that if there were more coins, the Goldbergs certainly would have brought them to the attention of the Internal Revenue Service and the court. They didn't mention any other coins. The diary entry that the court is referring to was a statement in the diary approximately six months before the decedent died, which said, dad thinks that he gave approximately 500 coins to Ira, and this was in reaction to something in the diary that said that there were 371 noted, and Mrs. Gonzalez said, I will look into it. That's the only thing in the entire record that indicates that there might be more coins. Nobody raised it during the course of the entire trial. Every coin was either stipulated to, or part of the trumpeter collection, or part of what they call the additional coins of 38 coins. There was absolutely nothing indicating that there were any coins missing, and out of the blue, the court comes up with 31 coins purportedly worth $425,000 that never was handled at the trial other than sitting there as an offhand entry in the diary six months before the decedent died. Thank you. In addition, there were items that we have spelled out that appear to be double counting for about $207,000, and then we gave as an example the valuation of a 5.22 carat diamond where the court appears to be at least $40,000 overvalued with the methodology which it used, in which it took a purchase in which three of the three diamonds were purchased. Is that the bulk purpose, the bulk purchase? That's correct. That's the bulk purchase in which the seller says there are three diamonds and you've had all together, it's $360,000 worth, but you're buying all three of them so you can have them for $175,000. The court assumed that the $360,000 was an appropriate price, compared one of the three diamonds purchased, and the comparison came out with a valuation of this particular diamond. That takes us down from the $4.5 million to about the $2 million range. That's confirmed when we come up from the bottom. Table 3 of the appellant's brief at page 39 assumes that every omitted asset as claimed by the government was omitted, despite the fact that a lot of these things were purchased four or five years before death, and put on the exact value as found by the court. If we take that approach, which is on page 39 of the brief, we get $2,037,000. Not $4.5 million. Table 4 at page 42 of the brief has a similar analysis, which goes back to the purchase of everything from the two main sources, Lloyd's and Mamie's. And if we add all those in and make a couple of adjustments which are spelled out in the argument, we only get to $1,750,000. I'd like at this time to be able to respond to any questions the Court has with respect to the omitted assets before moving on to the next issue, if I may. There don't appear to be any additional questions. Let me then move to the fraud issue. As preliminary items, first, this is not an audit lottery case. The accountants for the estate believed that it was a virtual certainty that this estate tax return would be audited. That was disclosed in the retention letter to the clients, and it was disclosed verbally. This return is going to be audited. There was no possibility here or likelihood that things were going to slip by. The taxpayers had full compliance. They filed all returns on a timely basis. They paid all And as a third preliminary item, let me point out the provisions of Internal Revenue Code Section 6663B, which indicates that if there is a portion of the underpayment determined to be fraudulent, that any portion of the underpayment which the taxpayer establishes by a preponderance of the evidence is not attributable to fraud, will not be subject to the penalty. So the penalty is not all or none, as it once was before the late 1980s when the law changed. It can be piecemeal. Well, now, the tax court's finding of fraud, we're reviewing that for clearly erroneous, correct? That's correct. Okay. Keeping in mind that the tax court found fraudulent intent in the taxpayers undervaluing the sterling stock based on, I think there's several things that I put my notes to myself. Gonzales knew that one month before the stock was valued at $15,335 for the 93 tax returns, it had been valued at $462,000. Gonzales knew a prior valuation of the sterling stock in excess of $3 million. Gonzales knew the preferred stock was accruing dividends daily at a substantial rate and that redemption was mandatory. Gonzales knew that redemption of preferred stock would result in millions of dollars in proceeds. With that in mind, what's your best argument that it was clearly erroneous? With respect to the fraud issue, first, the analysis was done by the accountants. They were aware that the preferred stock, which, by the way, it was $3 million out of a $31 million purchase. This was the tip of the consideration paid for the sale of Trompedore Electronics to Sterling. The shares were subordinated to all senior indebtedness, which by definition was all institutional indebtedness. If there was a default on the indebtedness, there could be no dividends and no redemptions. From 1989 through the end of 1992, although dividends were payable each year because of the subordination, no dividends could be paid. There were to be best effort redemptions of a third of the stock at the end of 1991 and 1992. Those did not take place. Accountant Bates went and got the financial statements. They showed that there was a deficit net worth of $5.3 million at the end of 1992. In other words, the obligations were $5.3 million greater than the assets on the books. The senior indebtedness had $3.1 million of interest that was owing and unpaid as of the court said that they waived that. They waived it because they got a $175,000 note at interest rates of 13 to 14 percent. Approximately half of the $24 million of debt bore interest at rates in the 13 to 14 percent range. All of those items led Ms. Bates, the accountant, and her partner, Logen, to believe that the preferred stock wasn't collectible. They disclosed that on the return. They showed the preferred stock. They had a two-page attachment, which they attached all of the relevant documents. The $482,000 that you just referred to was a footnote in a preliminary workup on the estate, and that footnote stated that it might be shown at a lower value because collectibility has not yet been determined. That was prior to the time that Ms. Bates concluded her analysis of the preferred stock. There perhaps might be enough support for the court to find value. In this case, the stock was redeemed at approximately $1,950,000, 22 months after the date of death. That was disclosed to the estate tax examiner at the beginning of the estate tax audit with the documents that led to it. The estate tax examiner just picked that number up. No discount for collectibility. Used that number and wrote it with the presumption of correctness. No valuation of any kind. We feel that there are several cases that have said where there is a valuation difference, and there's full disclosure. There's no fraud penalty. In fact, no penalty at all in many of these cases. The Sammons case that we cited had a charitable contribution deduction, approximately three times what the court allowed. The Payne case in the Fifth Circuit where the stock wasn't even disclosed on the return, and the court said even assuming that the stock had substantial value, we can't find fraud when there's a valuation dispute. In this case, there was a serious question of whether this preferred stock ever had any value and ever would have any value. Fully disclosed, fully analyzed by the accountants, and therefore, we feel that there certainly is no fraud penalty justifiable on that. Similarly, with respect to the gold coins, the dispute revolved on the return coin-by-coin, the denomination, the year, the value. The only difference   is that the estate valued the coins based on the premise that there was a binding agreement to have those coins auctioned a month later in a down market. That was disclosed in the return. That was the standard that was used. It was also disclosed that the estate had been successful in getting the auction postponed under an economic downturn clause in the auction agreement. The government in its memorandum of trial even acknowledged that if that standard was correct, the $3,451,000 value was all right. So the court said that's the wrong value. We can't assume a forced sale. We have to assume that these coins can be sold out in the future when the market is better. Had the court had the input of this court in the Morrissey decision in 2001, the court said you have to take the facts as they are for a state tax. This is an excise tax. You look at the moment of value. You don't look at what might happen in the future. It might have even had a different result. We're not challenging the valuation. We think there's enough support for what the court did in terms of value. But we do submit that for a fraud penalty, the standard was disclosed. There's a difference in a legal standard. It's certainly not fraud. Thank you. Good morning. May it please the Court. Randolph Hutter for the Commissioner. The tax court on remand followed this court's directions and provided a thorough explanation of its findings with regard to the unreported assets and with regard to the stock valuation. And those findings and explanation are fully supported by the record. With regard to unreported assets, the court was meticulous and painstaking in its explanation of what items should have been reported on the return and of the valuation of those items. Receipts from Lloyds and Mamie, canceled checks, an asset list compiled by the decedent and his accountant a mere one month before he died, testimony of people who knew the decedent personally and visited in his house. Each of these is strong evidence of the unreported items, both that the items existed and that they are includable in the decedent's estate. And what about the coins? There's the, because you don't have all 500 of them and I mean the 31 missing coins, as it were, are worth a lot of money. You know, what is there in the record that would allow the court to say there were 500? Only the diary entry and a finding by the court that underlies the entire opinion, and that is that the co-executors have no credibility. The tax court made that very clear, and the taxpayers spent the entire time in this case disputing whether most of the assets that ended up being found by the tax court as being includable in the estate, disputing whether they even existed. They did not work with the IRS on acknowledging that these might exist and a safe deposit box was seized and a million assets were found, and you would think at that point someone would say, okay, we better fully cooperate, but it didn't happen. And the tax court simply did not believe the co-executors, and if it found a piece of evidence regarding certain values and certain assets, it did not give them the benefit of the doubt, and I cannot say that they earned the benefit of the doubt on any of these things, because they fought tooth and nail on positions that looked patently incredible, and that's what underlies the tax court's decision. So the 500 comes from the diary, and that there essentially were caught lying on other things. That's the evidence that would support the 500. Exactly, exactly. And because the taxpayers would not engage in disputes about valuation of things, they would not acknowledge that it even existed. Therefore, there's no give and take in the parties on these valuations in some cases, and the tax court at the end was left with less evidence that it might in another case, because one party simply would not accept the fact that the assets even existed. But there were the receipts from Mamie and from Lloyds, and the taxpayers' explanation seemed to be that, well, most of those assets, they just disappeared. We don't know what happened to them. Well, and then a million or so was found in the safe deposit box. Well, of course, there is evidence here that all but 31 were accounted for. So is approximately 500, 500 less 31? Well, there were. The tax court did the best it could with the evidence it had, and there was a third party, Superior Coin, other parties that had the coins and could document that there were certain numbers of those. But the co-executors also had access to the coins, had access to the decedent's house at all times, and things did, things were taken from the home. It's not quite as good, though. Approximately 500 isn't quite as good as, say, 493. I have to absolutely accept that point and say that's true, and what underlines this is the taxpayer, the tax court's basically not giving anything to the taxpayer's credibility because they had undermined their own credibility so many times. And the taxpayer, the tax court was left struggling to find in the record what it could and to put together a value for it. Counsel? Yes. I would like to turn your attention to the question of the valuation of the preferred stock. I think we all know what it could be sold for between a willing buyer and seller, I guess it's six months post-death is what the standard is. At first you had a 4% discount, and now really without explanation except we're adding some more because of risk, we're going to make it 12%. Now, there is no evidence here as to what a willing buyer and seller would pay for it, as far as I can tell. No, not exactly. The arguments of the parties and the tax court considered that the, specifically said that a hypothetical buyer, it thought, would not require a great discount for risk because of the financial position of Sterling Holding Company. The tax court, in its original opinion, went through the fact that the company was showing a profit. It had net positive income, positive cash flow, rather, in each year. It was meeting its operating expenses. It was having some trouble, but it was also in a good position. Excuse me? That's the point. That's the point, Counselor. It was having some trouble. Yes. And the balance sheet didn't look good. And I'm quite uncomfortable. You've kind of pulled 12% out of a hat. I really don't know what the value should be, but it seems to me that there should have been more expert testimony sought by the the tax court is an annual discount rate. And the true discount value that the court comes up with is more than that, because it discounts three sets of dividends and redemption values and comes up with a total valuation with a discount that represents a 23% discount and notes that the government's position can be achieved by using a 19.45 annual discount rate and the full effective discount is 33%. The government asserts that it's worth approximately $2 million. The tax court determined that the full valuation of the stock without any discount at all under the contract, the annual discount rate, is 33%. That's the one arrived at by the government. And another thing supporting the tax court's original valuation, of course, too, is the decedent's own opinion that his stock was worth $3 million prior to his death. We don't have the evidence of what truly a buyer and seller would have traded this stock for, because, of course, the stock didn't trade. In fact, it's not really stock so much as it is part of a contract by Sterling to pay these proceeds. And it had the funds to pay the proceeds. And the tax court was completely correct in citing Sterling's determination to meet its contractual obligations, because in 93 and 94, Sterling sought refinancing and put its best efforts into paying these indebtedness, paying this indebtedness to the best of its ability. And it did so. And I think that that strength and its financial position can be seen from the financial reports and the records that are in this record that show that it had good income. It had electronics. It was a very strong industry. And its profits in particular had picked up in 1992, the year the decedent died. And so another thing is that this court observed what the tax court had written about rejecting the taxpayers' experts' analysis and said that that was well-reasoned. And it certainly was, because as the tax court spoke in its original opinion in great detail, the taxpayers' original appraiser, the expert, had compared the company at issue with companies that were in bankruptcy. There just were not parallel situations. And so the value that was reported on the return and the value that was promoted by the taxpayers in the tax court was not justified. In addition, it's true that the commissioner is basically left with the redemption that was actually paid by Sterling in 1994. But the taxpayers have little to show that a higher discount rate should be applied other than citing Morrissey and Shackleford. And Morrissey and Shackleford are completely different fact situations. And each circumstance, each case, I think, has to be addressed on its own merits. And even Shackleford, with a 50 percent discount, that's not a whole lot greater than the 33 percent discount that is effectively applied in this case. And Sterling was not that weak a company, as we can see. It met its obligations. It refinanced. It did have the dedication that the tax court says to meeting its obligations. And finally, with regard to fraud, the tax court correctly upheld the commissioner's imposition of a fraud penalty. The decedent purchased millions of dollars' worth of gems and jewelry and none were reported on his estate tax return. The executors removed items from the decedent's home. The executors claimed that the decedents gave them gems and jewelry before he died, but they never filed gift tax returns, even though they filed returns for other gifts. The executors withheld a coin appraisal from their accountant, a very important coin appraisal, but any appraisal would perhaps be important. They allowed an absurdly low value for the Sterling stock of $10 a share to be reported on the estate tax return. They caused a baseless claim of almost $1.5 million to be listed on the estate return as a liability. They did not cooperate with the IRS, and the safe deposit box where valuable gems and jewelry were found had to be seized by the IRS before its tax point toward fraud and support the tax court's findings. If the court has no questions? Yes. Counsel, on the deduction of this million and a half, what are the facts surrounding that? The facts surrounding that were that after the decedent died, I believe, an attorney, an accountant, I think it was Ken Logen, was it, brought to the executors and Mrs. Trumpeter's attention the fact that in the divorce proceedings, Mr. Trumpeter may not have disclosed all of the coins that Mr. Trumpeter owed to Mrs. Trumpeter, you understand, for purposes of the divorce settlement. But it turns out that he simply didn't have all the information correctly and that she did not have a claim, but she went as far as suing the estate for to be compensated for that. And the claim was basically acknowledged to be worthless because it was reduced and reduced. The executors finally acknowledged it was worth, if anything, much less than was originally alleged in the complaint. And the claim has never been paid, so you can't very well deduct any kind of million and a half claim from an estate as a liability, where you haven't paid the claim and don't intend to. Well, what were the facts at the time that the return was filed? What was the status of the claim at that point? I believe that all or most of that had been determined. I believe that the lawsuit had been dismissed and Mrs. Trumpeter's lawsuit had been dismissed at that time. And there was a liability that the co-executors or I can't remember if she actually prevailed or not. I suppose I'll have to leave some of that to Mr. Salkin. But there was an amount that the co-executors needed to pay, and so they took a claim on the estate, but they never paid it. They never paid the claim at all. Well, is that fraud? Oh, yes, Your Honor. It's got to be fraud. If there really was no claim, they pretty much acknowledged that... Well, the fact that they don't pay it is not controlling. Well, the tax court found that the claim was basically a way to get to their mother more of the estate that she could share in the wealth, as it were. And the tax court was clearly convinced that this claim basically didn't exist at all. And it is absolutely clear that Ken Lojan went off half-cocked, if you will, filing a complaint based on a claim without all the facts. So that doesn't appear to be a valid claim, and nothing supports it in the record. Thank you for your argument. Oh, no, you have time left. You have three and a half minutes. That was just thank you for his argument, and I'll thank you again when you're done. May I first address cooperation? The estate tax examiner testified that she received every item of information, including canceled checks, receipts from Lloyd's, everything else that she asked for, well over 100 pages from the accountants. Her only complaint was, it took over 60 days from the time I first asked for it to get it. That was the only complaint of lack of cooperation. Admission by the executors, they believed that by reason of having received a canceled check, they were not taxable. They were wrong. They were told they were wrong before the tax court petition was filed. The tax court petition acknowledged that all of these items were includable. One second. Yes. We lost Judge Fletcher. I can still hear you. Can you hear me? We can't see you, but as long as you can hear us, we know what you look like now. Okay. The tax court petition, every pleading and even an opening statement by their counsel, acknowledged that these items were all taxable. The only issue that was out there was valuation. The prior appraisal related to an appraisal was used in an effort to increase the value of these coins. The appraiser said, if you can hold these coins for an indefinite period of time, it could be five years, it could be ten years, it could be longer, they're going to have a lot of value. I think he was up around $8 million. But if you sell these coins now in this market, it's $3.5 million. That's nothing other than a standard of appraisal dispute, which the court resolved against the taxpayer that is certainly not fraudulent. Well, I'm not sure we have. Do we? Judge Fletcher? Oh, okay. We thought we lost you again. Go ahead. With respect to the claim by the decedent's mother that was disclosed on the return, her name was on there. It was disclosed who she was, $1,486,000. Obviously, it's going to get scrutiny on audit. The accountant said, we know that Mr. Trompeter concealed coins during the course of the divorce. From everything I've seen, it appears that more coins were concealed than monies owed to Mrs. Trompeter. Her daughter said, what any daughter should say is, if we owe our mother money, find out the right amount and we'll pay it. Before they had a chance to pay it, all of the chaos broke loose with a jeopardy assessment for some $22 million, which was above and below what they had access to, and they didn't pay it. Whether they paid it to date or not, I don't know, but it's probably not. So, with that, I do appreciate the additional time for rebuttal. Thank you. It was your time. Thank you for your argument. This matter will now stand submitted.
judges: B. Fletcher, Tashima, Callahan